FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUL -7 AM 10: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

BRENDA CASH,                              )
                                          )
          Plaintiff,                      )
                                          )        CV-98-P-1367-S
-vs.-                                     )
                                          )
ALABAMA POWER CO., INC.,                  )
and SYLVIA SMITH,                         )
                                          )
          Defendants.                     )

ENTERED

JUL 07 1999

### MEMORANDUM OPINION

Before the court is the defendants' Motion for Summary Judgment, filed on October 15, 1998 and taken under submission as of November 13, 1998. For the reasons expressed below, the court finds that the defendants' summary judgment motion is due to be granted in full.

### Facts

The plaintiff, Brenda Cash, is a 41 year-old white female who works for the defendant, Alabama Power Co., Inc., ("APCO") in Birmingham, Alabama. Although she is currently employed in the Customer Services Department of APCO, Cash began her career with the power company in the Print Shop in 1985. Cash was initially hired as a contract employee in the Print Shop but was promoted to a regular full-time employee in the Print Shop in 1989, where she performed typesetting functions. Except for a short period of time in which she worked in APCO's Travel Services Department, Cash worked exclusively in the Print Shop until May 1998.

The Print Shop at APCO is an in-house department that provides a broad range of printing

1

37

services for the power company. Until September 15, 1997, Cash's supervisor in the Print Shop was Marvin Fritz. Under his supervision, Cash was selected in 1996 to implement the "PSI" system, a new computerized tracking system purchased for the Print Shop.[1] Although Cash had previously worked with a manual tracking system, she had no experience working with a computerized tracking system like the PSI. Although APCO provided Cash with assistance and technical support with regard to the tracking system, Cash apparently had difficulty getting the computerized system up and running. The target date for the system to "go live" was January 1998.

After Fritz retired from APCO in 1997, Sylvia Smith, one of the defendants in this case, became manager of the Print Shop At the time of Smith's appointment to head of the Print Shop in September 1997, Cash's job responsibilities included working to implement the tracking system, keeping employee time sheets, and performing certain administrative tasks. Because the PSI system was not yet operational, Smith called in a Georgia Power employee to assist Cash with the tracking system and informed Cash that implementation of the tracking system would be Cash's primary job from that point on Cash was apparently unable to set up the system or train employees in the use of the PSI system to Smith's satisfaction. The system did not "go live" in January 1998. Indeed, the system is apparently still not operational.

After Smith's appointment to the Print Shop, Cash claims that Smith treated her discriminatorily because of her disability or, in the alternative, with regard to her disability. According to Cash, Smith denied her medical leave, retaliated against her, and terminated her position in the Print Shop only to rewrite the job description and hire someone else  Cash claims to suffer

---

[1]The purpose of the PSI system was to enable the print shop to track orders and follow them through production, assign overhead costs to orders, and to computerize the billing functions in the shop.

2

from various ailments, including seizures, non-insulin dependant diabetes, migrane headaches, depression, high blood pressure, and mitral valve prolapse. The seizures of which Cash complains began occurring in 1997 as a result of the removal of a brain tumor in 1988. According to Cash's primary treating physician, Cash's "seizures" are episodic and last only a matter of minutes. Cash does not lose consciousness when she has a seizure, but the left side of her face and arm become numb. Cash sits down when she has the seizures, which normally occur at night. Cash testified that she had only one seizure at work in 1997 and that there is nothing she cannot do as a result of her seizures. Cash's doctor also testified that her severe migrane headaches and panic attack symptoms can be impairing for a short period of time. However, none of Cash's doctors have placed any restrictions on her due to her various medical conditions. Cash is able to hold a job and work a normal workweek, as she has for the past five years. Even when all of Cash's medical conditions are considered together, her own doctor says that she is not disabled and that in general her problems are treatable.

As a result of Cash's medical problems, as well as for other reasons, Cash began to miss work on a frequent basis during the latter part of 1997 and early 1998. After Cash used up all her paid leave (both sick and vacation leave) in 1997, APCO apparently permitted Cash to be absent from work whenever she had a health-related problem. Beginning on January 1, 1998, Cash became entitled to a new year's worth of paid sick leave and paid vacation leave. From January until May of 1998, when Cash was transferred out of the Print Shop, her absences for both health and non-health related reasons were charged against her paid leave. Apparently, however, as 1998 progressed, Smith became concerned about Cash missing work for non-health related reasons and Cash's difficulty keeping up with her workload. According to Smith, because Cash had missed so

3

much work and because APCO did not know whether Cash's medical conditions constituted a "serious health condition" that would entitle her to FMLA leave, Smith asked Cash to complete standard FMLA paperwork and turn it in to the Disability Management Department. After meeting with Cash, her physician, Dr. Beaty, told Cash that she did not require any FMLA leave. Cash therefore did not request FMLA leave up until the time she filed her lawsuit.[2]

Cash also complains that she was denied appointment to a newly created position in the Print Shop. After the resignation of a Print Shop employee in January 1998, Smith decided to use the vacancy to create a new position called "Printing Specialist." Both Cash and another Print Shop employee, Phyllis Vaughn, performed the typesetting duties resulting from the employee's resignation up until the time that the new position was created. The new position was posted internally and Cash, along with eleven other persons, applied for the job. The job description for the Printing Specialist position stated that the employee was expected to:

> implement and coordinate activities associated with a job/cost tracking system; design and manage a charge back/billing process that assures full cost recovery; provide full customer support for all printing requests including problem resolution; build strong relationships with vendors; provide day to day support for Print Shop; and to act on supervisor's behalf on designated matters

According to Smith, the members of the hiring committee determined that the Printing Specialist must have the skills necessary to get the PSI system fully implemented.

The hiring committee interviewed and then ranked the twelve candidates for the position according to their score on an Initial Candidate Pool Screening. From this, the committee determined

---

[2]Cash did make an FMLA request in August of 1998, two months after she filed her lawsuit. Cash asked for FMLA leave from July 28, 1998 through August 30, 1998. APCO granted the FMLA request. Apparently, Cash began suffering from severe depression in August 1998.

who to call back for a second interview. Four candidates were selected for second interviews. Cash was not one of the four selected. The committee ultimately chose Mary Guarino to fill the position. Ms. Guarino was recovering from cancer at the time she was selected and APCO asserts that the committee regarded her as disabled

Cash further complains that Smith publicized Cash's diabetic condition without her consent in late 1997. Cash was diagnosed with non-insulin dependent diabetes in October 1997. Shortly after learning of the new condition, Cash sent Smith an email message informing her that she had diabetes and that she would need to take time off work to see her doctor. According to Cash, she sent Smith another email later in the day requesting that Smith not tell anyone about her diabetes. Cash alleges that Smith informed Cash's co-workers that Cash was diagnosed with diabetes during a morning staff meeting. Smith denies ever receiving the second email or informing the employees of Cash's condition.

In May 1998, Smith says she met with Cash to discuss Cash's work performance, including her failure to timely complete her work, her attendance, and her failure to give written notice of her vacation time. Cash was given a list of "expectations" but was not disciplined in any way. Although Cash alleges that Smith told her to look for another job because of her disability, Smith denies ever making such a statement. Cash applied for and received a Customer Service Representative position in May 1998, however   She is still employed in that department and earns more money than she did in the Print Shop

Cash filed suit on May 28, 1998. In her complaint, Cash asserts claims for unlawful disclosure, invasion of privacy, interference of business relations, and violations of the ADA, Rehabilitation Act and Family Medical Leave Act. Cash claims that she is disabled but "does not

5

request any special accommodation to be able to continue performing her job other than ordinary use of medical leave on an intermittent basis consistent with the Family Medical Leave Act and the company's medical leave policies and procedures."

Analysis

I ADA Claims

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against qualified individuals with disabilities with regard to hiring, promotion, training, termination, and other terms and conditions of employment because of that individual's disability. See 42 U.S.C. § 12112(a). Under the ADA, employers are charged with providing reasonable accommodations for employees with known disabilities unless doing so would result in undue hardship See 42 U S.C § 12112(b)(5)(A).

A plaintiff can present either direct or circumstantial evidence in support of her ADA claim. Direct evidence is that which is unambiguous in its meaning, such as a decisionmaker's discriminatory remarks made in the context of an employment decision. See Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir 1989). In the present case, the plaintiff has no direct evidence of intentional discrimination.

A plaintiff may also present circumstantial evidence of discrimination under the familiar burden-shifting formula of McDonnell Douglas and its progeny. See 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)[3] The first step of the burden shifting analysis requires the plaintiff to establish a

---

[3]It is well-settled that the burden shifting analysis used in Title VII cases applies to ADA cases as well.

prima facie case of discrimination by showing that (1) she has a disability, (2) she is a qualified individual, and (3) she was subjected to unlawful discrimination as a result of her disability. See Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 910 (11th Cir. 1996). The plaintiff must also show that the employer had actual or constructive knowledge of his disability. Gordon, 100 F.3d at 910.

In the second step of the analysis, the burden of production shifts to the defendant to rebut the presumption of intentional discrimination raised by the prima facie case by setting forth legitimate, non-discriminatory reasons for contested employment action.    Burdine, 450 U.S. at 253.  If the defendant produces legitimate, nondiscriminatory reasons, then the plaintiff must show that the defendant's stated reasons are mere pretexts for unlawful, discriminatory motives.  Id.

A. Is the plaintiff "disabled"?

The ADA defines "an individual with a disability" as one who:

(1)    has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, or
(2)    has a record of such impairment, or
(3)    is regarded as having such an impairment.

See 42 U.S.C. § 12102(2).  In this case, the plaintiff apparently asserts that she is disabled as defined under both the first, second and third definitions of §12102(2).

1. Is the plaintiff substantially limited in a major life activity?

In order to show that she qualifies for coverage under this aspect of the ADA, Cash must show that she is actually disabled.  To do this, she must show that her claimed physical or mental

7

impairment substantially limits one or more of her major life activities. While the ADA does not define the terms "substantial limitation" or "major life activities," courts may rely on the EEOC regulations for guidance  The EEOC regulations define a "substantial limitation" as an inability to perform, or a significant restriction in the condition, manner or duration under which an individual can perform a particular major life activity as compared to the average person. See 29 C.F.R. § 1630.2(j)(1).[4]  The regulations go on to define "major life activies" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See id. The determination of whether a plaintiff is "disabled" under this definition is made on a case-by-case basis, based on the effect the impairment has on the particular plaintiff's life. Although a plaintiff may have an "impairment," unless it rises to the level of substantially limiting one or more major life activities, the plaintiff is not "disabled" as defined under the ADA.[5]

In the present case, it is unclear exactly which of the plaintiff's ailments she claims substantially limits a major life activity during the relevant time frame.[6] In her complaint, Cash cites to a "seizure" condition as well as diabetes. However, her deposition reveals several other conditions that are apparently applicable to this litigation, including depression, mitral valve prolapse, and obesity. While it is obvious that Cash suffers from a number of "impairments," none rise to the level

---

[4] In determining whether an impairment substantially limits a major life activity, a court should look to the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact of the impairment. See 29 C.F.R. § 1630(j)(2).

[5] The EEOC regulations provide that the major life activity of working should be considered only after a determination that the individual is not limited in any of the other major life activities. See 29 C F R § 1630.2(j).

[6] The relevant time period appears to be September 1997 to May 1998, the period in which Sylvia Smith was Cash's supervisor in the Print Shop.

8

of substantially limiting a major life activity.  Looking at the conditions separately and as a whole,

Cash is not restricted in her ability to care for herself, perform manual tasks, walk, talk, see, hear,

speak, breathe, learn or work.  Cash's seizures occur mostly at night and last from a few seconds to

ten minutes.  In fact, Cash only had one seizure at work during 1997.  The seizures affect only

specific parts of her body and cause numbness in her left side.[7]  Cash's non-insulin dependent diabetes

also does not substantially limit any major life activities.[8]  The depression condition, while *now*

apparently disabling, did not substantially affect a major life activity during the time period relevant

to this litigation.  The hypertension and mitral valve prolapse are also not substantially limiting to

Cash.  Although Cash claims that she is disabled as a result of her various conditions, her doctor

testified that even when Cash's ailments are considered in total, she is not disabled and her ability to

work is not substantially limited.[9]  Indeed, Cash has been able to work a forty-hour work week for

---

[7]Cash's doctor testified:

Q:  Does Ms. Cash's - in your opinion, doctor, does Ms. Cash's seizure disorder
    prevent her from engaging in gainful employment?

A.  At this time, no.

Q:  All right.  Since you've been treating her, has Ms. Cash been unable to hold a job
    because of her seizure disorder?

A:  No

Q:  Since you've been treating Ms. Cash, in your opinion, has her seizure disorder
    substantially limited her ability to carry on a normal life in any way?

A:  I think the actual seizures themselves have not.  I think the fact that she has a
    seizure disorder has been emotionally distressing to her.

See Beaty Deposition p. 123-24.

[8]Cash's diabetes would not affect her normal activities even without medication.  If
untreated, the diabetes could increase the risk that Cash could suffer more serious health problems
in the future

[9]Cash's doctor, Dr. Beaty, confirmed that Cash was first diagnosed with clinical
depression at least five months before Sylvia Smith became the Print Shop supervisor.  However,
Dr. Beaty also makes clear that the only way the depression affects Cash's ability to work is that

the past five years and testified in her deposition that she is physically active and can do "whatever." Although Cash's seizures may cause her to experience numbness in certain parts of her body, requiring her to have to sit down during the short duration of the seizure, such "intermittent, episodic impairments are not disabilities." Hamm v. Runyon, 51 F.3d 721, 725 (7th Cir. 1995) (quoting Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 544 (7th Cir. 1995)). Because Cash has failed to show that she has a physical or mental impairment that substantially limits one or more of her major life activities, the court finds that summary judgment is due to be granted under the first definition of "disability" under the ADA.

### 2. Did the plaintiff have a "record of impairment"?

A plaintiff in an ADA case may still be considered "disabled" if she has a "record of impairment" that substantially limits a major life activity. 42 U.S.C. § 12102(2)(B). In this case, Cash apparently seeks to have her medical history regarding her benign brain tumor treated as "a record of impairment" under the ADA. However, in order to have a record of a disability, the ADA plaintiff must actually suffer from a disability as defined under the Act. Here, Cash has not shown that she had a record of impairment that substantially limited a major life activity. As stated above, although Cash admittedly suffers from a variety of impairments, those impairments, both individually and as a whole, do not qualify Cash as having as an ADA protected disability. Therefore, Cash's claim under the second definition of disability is due to be dismissed.

### 3. Was the plaintiff "regarded as" disabled?

---

it makes her feel less "fulfilled in her work." See Beaty Deposition p.75, 144-45.

Even if an individual cannot satisfy the first or second part of the ADA's definition of "disability," she may still be able to satisfy the third prong of the definition, providing that a person who is "regarded" by an employer "as having such impairment" - one that substantially limits a major life activity - is an individual with a disability. See 42 U.S.C. § 12102 (2)(C). Mere knowledge by an employer that an employee has an impairment is not enough to establish a perceived disability claim

In this case, Cash has not presented any evidence to support her claims that APCO regarded her as disabled. Indeed, in an interoffice memorandum, Cash states, "Sylvia [Smith] doesn't consider my condition as a disability." Although Smith knew of Cash's medical conditions and discussed potential sick leave for Cash with APCO's Disability Management Department, knowledge alone is not enough to prove a perceived disability claim. While Smith regard Cash as having an impairment, there is no evidence to show that Smith perceived that impairment to substantially limit a major life activity.

As Cash is not disabled under any definition set forth in the ADA, she does not fall within its protection. Accordingly, because Cash has not presented a prima facie case of discrimination, summary judgment is due to be granted to the defendants as to the ADA claim.[10]

II. Rehabilitation Act Claim

The Rehabilitation Act provides that an employer who receives federal funds may not discriminate against an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). Under

---

[10]Because the court concludes that Cash does not have a disability for purposes of the ADA, the court need not address whether Cash established the other elements of her ADA claim.

11

the Rehabilitation Act, a handicapped individual is one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 U.S.C. § 796(8)(B). The substantive standards for determining liability under the Rehabilitation Act and the ADA are essentially the same.

Even assuming for summary judgment purposes that Cash has satisfied her burden to show that APCO is subject to the Rehabilitation Act as a recipient of federal funds, Cash is still unable to survive summary judgment on this claim. Because a Rehabilitation Act analysis is essentially the same as that used in an ADA claim, and because Cash has not presented a prima facie case of discrimination under the ADA, her Rehabilitation Act claim is due to be dismissed.

III. Family and Medical Leave Act

In her Complaint, Cash asserts that APCO violated the FMLA by subjecting her to "terms and conditions of employment that similarly situated non-disabled employees are not subjected to including denial of consideration for positions, removal from her position, demotion, and disciplinary action based on use of medical leave and FMLA leave in connection with plaintiff's disability." (See Complaint ¶ 17). Cash also asserts a separate count under the FMLA for removal/demotion, stating that APCO violated the Act "by denying her consideration for positions, removing her from her job, demoting her, implicitly threatening her with discharge, and placing her in a temporary position because of her disability." (Complaint ¶ 18)  Because the two claims are essentially the same, the court will analyze them together under the familiar burden-shifting approach of McDonnell Douglas/Burdine

The FMLA allows full-time employees who have worked for a qualified employer for more

than one year to have leave time for certain family and medical emergencies. See 29 U.S.C. § 2611(2). To maintain a prima facie case for a violation of the FMLA, a plaintiff must show that: (1) she is protected under the FMLA, (2) she suffered an adverse employment action, and (3) a causal connection between the two events. See Dollar v. Shoney's Inc., 981 F. Supp. 1417 (N.D. Ala. 1997). At the outset, the court disposes of Cash's claim under the FMLA for failure to prove a prima facie case. In this case, at the point that APCO was put on notice that Cash's intermittent absences were potentially FMLA qualifying, APCO provided Cash with the appropriate paperwork. Cash's physician, however, determined that Cash did not require FMLA leave and Cash did not turn in the FMLA paperwork [11] Cash has failed to show that she falls under the protection of the FMLA or suffered an adverse employment action that was causally connected to Cash's use of medical leave.

Even assuming that Cash has presented a prima facie case of a violation of the FMLA, APCO has presented legitimate, non-discriminatory reasons for its actions   Although Cash claims that she should have received the job of Printing Specialist, Cash is unable to show that the defendant's reasons for not choosing her were pretexts for discrimination. Indeed, the defendants acknowledge that the person hired for the Printing Specialist position had cancer (which the defendants assert is a disability) and assert that Cash's various impairments did not affect the decision not to hire her for the position. Although Cash perceives a discriminatory animus on the part of APCO and Smith, the evidence fails to show such discrimination or any evidence of pretext. Therefore, this claim is due to be dismissed.

---

[11]Although Cash later requested and was granted FMLA leave relating to a depression episode that occurred *after* this lawsuit was filed, that episode is irrelevant to this analysis.

IV. Unlawful Disclosure

In Count I of her Complaint, Cash asserts a claim against the defendants for unlawful disclosure under state law, the FMLA, ADA, and the Rehabilitation Act. The claim relates to an incident in which Smith allegedly told co-employees during a meeting that Cash had been diagnosed with diabetes without Cash's knowledge or permission. Smith denies making such a statement about Cash.. Regardless, Cash admits in her deposition that she discussed her various medical conditions with co-workers "when they asked her about it." Simply put, Cash's claim fails to rise to the level of an actionable claim under either state or federal law. This is especially true when, as here, the plaintiff admits to discussing her medical status with co-workers. The plaintiff's unlawful disclosure claim is due to be dismissed

V. Invasion of Privacy

Cash's invasion of privacy claim against APCO and Smith also relates to Smith's alleged disclosure of Cash's diabetes during a work meeting. Although there are four different prongs within the invasion of privacy tort, Cash apparently attempts to assert claims for (1) intrusion upon the plaintiff's physical solitude or seclusion, and (2) publicity which violates the ordinary decencies. See K-Mart Corp. v. Weston, 530 So 2d 736, 738 (Ala. 1988). Although Cash argues that Smith invaded her right to privacy by allegedly informing co-workers that Cash was diagnosed with non-insulin diabetes, the court finds that no genuine issues of material fact exist and that the defendant is entitled to judgment as a matter of law. No reasonable jury would find that Cash's desire for privacy had been interfered with when Cash herself admits to discussing her medical conditions with co-workers. Even assuming for the purposes of summary judgment that Smith did indeed make such a

14

statement regarding Cash's diagnosis, a reasonable jury would not find that such a statement violated the ordinary decencies, especially in light of Cash's own publication of her conditions. Summary judgment is due to be granted as to this claim.

## VI. Interference with Business Relations

Under Alabama law, "an employer cannot be liable for tortious interference with its own contract." Hickman v. Winston County Hosp. Bd., 508 So. 2d 237, 238 (Ala. 1987). Therefore, APCO could not be liable for intentional interference with its own contract in this case.[12]

Similarly, employees and supervisors will not be liable for interfering with a contract between an employee and the employer "unless those persons were acting outside their scope of employment and were acting with actual malice." Id. at 239. Cash's claim for intentional interference with business relations against Smith is somewhat confusing. Apparently, Cash asserts that Smith knew of Cash's "emotional sensitivity . . . arising from her numerous physical problems" and set out to eliminate the plaintiff from her position at APCO. However, Cash has presented absolutely no evidence that Smith acted outside of the scope of her employment or with actual malice. Therefore, the court finds that summary judgment is due to be granted on this claim.

### Conclusion

For the foregoing reasons, the defendants' summary judgment motion is due to be granted in full

Date: _July 6_, 1999.

---

[12]The court does not believe that Cash intended to assert a claim for intentional interference with contractual relations against APCO.

Chief Judge Sam C. Pointer, Jr.

Service List.
    Claudia H Pearson
    Edward S. Allen
    Marcel L. Debruge
    Douglas B. Kaufman

16